United States Court of Appeals,

Fifth Circuit.

No. 92-4527

Summary Calendar.

Tony D. COLEMAN, as Sole Heir and Beneficiary of the Estate of Charlie D. Coleman, Deceased, Plaintiff-Appellant, Cross-Appellee,

v.

CHAMPION INTERNATIONAL CORPORATION/CHAMPION FOREST PRODUCTS, et al., Defendant-Appellees, Cross-Appellants.

June 4, 1993.

Appeal from the United States District Court for the Eastern District of Texas.

Before HIGGINBOTHAM, SMITH, and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

## I. FACTS and BACKGROUND

This case, a suit for pension benefits, is controlled by ERISA. Tony Coleman ("Coleman") brought suit to the recover proceeds of a pension plan, asserting that he was the beneficiary of Charlie Coleman. Charlie Coleman, Coleman's father, worked at Southland Paper Mill, Inc. ("Southland") from 1964 to 1978. St. Regis Paper Co. ("St. Regis") acquired Southland through merger in December 1977, and Champion International Corp. ("Champion"), in turn acquired St. Regis through merger in 1984.

Southland established a pension plan for its employees on January 1, 1954 entitled "The Retirement Plan for Salaried Employees of Southland Paper Mills, Inc." (the "Plan"). The Plan was amended periodically as mandated by federal law. Charlie Coleman was an active participant in the Plan with Southland, and later, with St. Regis. After St. Regis acquired Southland, Plan participants could elect to remain covered under the Plan or to shift their coverage to the qualified retirement plan sponsored by St. Regis. Coleman chose to remain covered under the Plan. Benefits under the Plan were payable in the form of a life annuity of $155.61 each month, beginning at age 65. Coleman was divorced at the time that he terminated employment and he never remarried.

The Plan provides participants with several pension payout options. An employee who terminates after becoming fully vested, but prior to age 65, can elect to start receiving his pension payments ("pay status") any time after age 55. Such a choice reduces the amount of the annuity payment to the actuarial equivalent of a life annuity beginning at age 65. The Plan further provides that if a terminated vested employee dies before going into pay status, no pension is payable under the Plan unless the employee has elected to be paid in the form of a joint and spousal survivor annuity. This annuity provides benefits to the employee's surviving spouse after the employee's death.

The Plan provides those electing to go into pay status can receive other forms of payments including: (1) various joint and survivor annuities providing for payments after one's death and (2) an annuity for one's own lifetime, with payments guaranteed for a certain number of years (e.g. 5, 10, 15, 20), with the remaining guaranteed payments going to a designated beneficiary if the participant dies before the relevant fixed period. Monthly benefits under these options are also adjusted to the actuarial equivalent of a life annuity beginning at age 65.

In 1978 pension sponsors published the Revised Pension Summary Plan Description ("1978 SPD"). The 1978 SPD describes how terminated vested participants can elect to begin pension payments as early as age 55. It further explains how a participant can opt for the various forms of payment, e.g. how one might provide for his spouse or other designated beneficiary.

The 1978 SPD describes the "Lifetime Only Income" as the payment option providing the largest monthly income; however, under this particular option the Plan does not pay any benefits after the participant's death. The Lifetime Only Income option is the normal form of payment to Plan participants, who are unmarried at the time of death, and the Plan pays all benefits under this particular option unless the participant specifically requests otherwise.

Charlie Coleman attained age 55 on July 23, 1986 and died on March 22, 1987. At the time of his death Coleman (1) was divorced and had not remarried, (2) had not elected to go into pay status, (3) had not elected any form of optional payment, and (4) had not designated a joint pensioner or beneficiary to receive benefits under one of the optional forms of payment after his death. The Plan provided specifically that if an unmarried terminated vested participant, such as Charlie Coleman,

died before going into pay status, the Plan would not pay any pension benefits.[1]

Coleman initiated this suit against Champion to recover the full amount of his father's pension, plus damages and attorney's fees. Coleman alleges that Champion failed to send Charlie Coleman various required notices, including REA[2] notices, and failed to send updated information reflecting the changes in the company sponsoring and maintaining the Plan. Coleman also seeks a $100 per day penalty for Champion's failure to provide him with Plan information on request. Coleman further asserts that Champion's failures prevented Charlie Coleman from exercising his Plan rights and exercising his options for receiving Plan benefits.

Champion filed a motion for summary judgment, arguing that Coleman did not have standing under ERISA to bring this action because he is neither a "participant" nor a "beneficiary" as defined by ERISA. Coleman responded with a cross-motion for summary judgment alleging that Champion maliciously and wilfully violated ERISA participant notification requirements.

The district court held that Coleman had standing to bring the action under ERISA, but did not have standing to seek the $100 per day penalty for Champion's alleged failure to provide the requested information. However, the district court granted Champion's motion for summary judgment on grounds that (1) the REA notices did not have to be sent to employees who terminated employment prior to 1984 and (2) the 1978 SPD had adequately notified Charlie Coleman both of his right to begin receiving his pension as early as age 55, and of his right to designate a beneficiary to receive payments after his death. Coleman appeals the district court's summary judgment in favor of Champion. Champion cross-appeals the district court's holding that Coleman has standing to sue under ERISA.

---

[1]When he ceased employment in 1978, Charlie Coleman was 100 percent vested in the Plan. The pension was payable to him either as a single life annuity of $155.61 per month at age 65, or as early as age 55 in the actuarially-reduced amount of $80.92 per month.

[2]Retirement Equity Act of 1984, Pub.L. No. 98-397, 1984 U.S.C.C.A.N. (98 Stat.) 1426 303(3)(2) (permitting an employee, who had terminated employment prior to August 23, 1984, but who had not yet started to receive his pension, to provide his surviving spouse with a pre-retirement pension in the event he died before starting to receive his pension). Because Charlie Coleman was not married, such election was not available to him, and notice was unnecessary. *See also,* Treas.Reg. § 1.401(a)-20 Q & A-25(a) (1988) (stating that an unmarried participant is deemed to have waived this election).

## II. STANDING ANALYSIS

We have recognized that standing is essential to the exercise of jurisdiction and is a "threshold question ... [that] determin[es] the power of the court to entertain the suit." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975); *U.S. v. One 18th Century Colombian Monstrance,* 797 F.2d 1370, 1374 (5th Cir.1986), *cert. denied,* 481 U.S. 1014, 107 S.Ct. 1889, 95 L.Ed.2d 496 (1987). We now turn our attention to this question, and address each of Coleman's asserted bases of standing.

### 1. Statutory Basis

Section 502(a) of ERISA, 29 U.S.C. 1132(a) (hereinafter, "§ 1132(a)"), ERISA's civil enforcement provision, limits those who can maintain suits under the statute to "participants," "beneficiaries," or "fiduciaries".[3] Coleman is not, and never has purported to be, a "participant,"[4] or "fiduciary"[5] as defined by ERISA; therefore, if he is to establish standing under § 1132, he must satisfy the statute's definition of "beneficiary."

ERISA defines "beneficiary" as "a person designated by a participant, or by the terms of any employee benefit plan, who is or may become entitled to a benefit thereunder." ERISA § 3(8), 29 U.S.C. § 1002(8). Under this definition, Coleman is not a beneficiary. Charlie Coleman never designated his son or anyone else as beneficiary of his Plan assets[6]; therefore, Coleman's assertion

---

[3]The Secretary of Labor is authorized to bring suit in certain situations outlined in 29 U.S.C. 1132(a)(2), a(4), (a)(5), and (a)(6).

[4]ERISA § 3(7), 29 U.S.C. § 1002(7) defines "participant" as any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit.

[5]ERISA § 3(21), 29 U.S.C. 1002(21) defines "fiduciary" as a person who (i) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) has any discretionary authority or discretionary responsibility in the administration of such plan.

[6]Appellant argues that if certain notices had been sent to Charlie Coleman, then Charlie Coleman would have named appellant his beneficiary. This assertion is speculative at best, and we do not agree that the mere possibility that one could potentially have been named beneficiary is

of beneficiary status rests upon the language and terms contained in the Plan.[7]

Section 4.2 of the Plan defines "beneficiary" as "any one or more of the persons comprising the group consisting of the participant's spouse, the participant's descendants, the participant's parents or the participant's heirs at law, ... or (b) the estate of such deceased participant ..." Coleman argues that because he is Charlie Coleman's descendant, heir at law, and the representative of Charlie Coleman's estate, under Plan Section 4.2, he is Charlie Coleman's beneficiary for purposes of § 1132. We do not share appellant's view.

Plan Section 4.2 directs the Retirement Committee to designate a beneficiary from the aforementioned group if (1) death benefits are payable at the time of the Plan participant's death; (2) if the participant failed to specify an alternate payment option; *and* (3) if the participant failed to name a beneficiary. Crucial to this directive is that death benefits be "payable" at the time of the participant's death. In this case no death benefits were payable at the time of Charlie Coleman's death.

The Plan provides specifically that if an unmarried, terminated participant such as Charlie Coleman dies before beginning to receive his pension, no pension benefits are payable or owing. Plan Section 2.5(a). Charlie Coleman elected to remain under the normal Lifetime Only Income payment option. While this Plan option provides the greatest amount of monthly income, the Plan states clearly that, under this option, at the time of the participant's death, all pension benefits cease.

Because no pension benefits were payable at the time of Charlie Coleman's death, the Retirement Committee was not, and is not now, authorized to name a beneficiary from the list in Section 4.2. As such, the terms of Plan Section 4.2 do not afford Coleman beneficiary status as

sufficient to confer status under § 1132. *See, Keys v. Eastman Kodak Co.,* 739 F.Supp. 135 (W.D.N.Y.1990), *aff'd,* 923 F.2d 844 (2nd Cir.1990) (holding son, not designated beneficiary by father, "stood no closer to beneficiary status than any other person"); *Lerra v. Monsanto Co.,* 521 F.Supp. 1257, 1263 (D.Mass.1981) (surviving spouse lacked standing when held not to be beneficiary in absence of deceased's designation as such).

[7]Appellant asserts that he is a "beneficiary" under Treasury Regulation 1.401-1, which states that the term "beneficiary" includes "the estate of the employee, dependents of the employee, persons who are the natural objects of the employee's bounty, and any persons designated by the employee to share in the benefits of the plan after the death of the employee." This definition, which is meant only to define the permissible scope of the term "beneficiary" for purposes of the exclusive benefit rule in I.R.C. § 401(a), does not control this case. Beneficiary is defined both in ERISA § 3(8) and in § 4.2 of the Plan; resort to Treasury Regulation 1.401-1 is inappropriate.

contemplated in § 1132. Coupled with the fact that Charlie Coleman did not name his son as his beneficiary, this conclusion forecloses any *statutory* basis for Coleman's assertion of standing.

Appellant next asserts alternative, non-statutory bases to support his claim of beneficiary status.

### 2. *Fentron "Non-Enumerated Party" Analysis*

Relying on *Fentron Indus., Inc. v. National Shopmen Pension Fund,* 674 F.2d 1300, 1304-05 (9th Cir.1982), Coleman argues that standing to bring an action under ERISA is not limited to the list of parties enumerated in § 1132. The court in *Fentron,* looking to legislative history of ERISA, held that § 1132's list of possible plaintiffs was not exclusive, and concluded that employers could bring ERISA actions as well. *Fentron* employed a three-part analysis and held that in order to bring an action, a plaintiff must: (1) suffer an injury in fact; (2) fall arguably within the zone of interests protected by the statute; and (3) show that the statute itself does not preclude suit. *Id.* at 1305.

We have rejected the *Fentron* "non-enumerated party" standing concept previously, and do so again today. "Where Congress has defined the parties who may bring a civil action founded on ERISA, we are loathe to ignore the legislature's specificity. Moreover, our previous decisions[8] have hewed to a literal construction of § 1132(a)." *Jamail, Inc. v. Carpenters Dist. Council of Houston Pension & Welfare Trusts,* 954 F.2d 299, 302 (5th Cir.1992), *citing Hermann Hosp. v. MEBA Medical & Benefits Plan,* 845 F.2d 1286, 1289 (5th Cir.1988).

"... [O]nly Congress is empowered to grant and extend the subject matter jurisdiction of the federal judiciary, and ... courts are not to infer a grant of jurisdiction absent a clear legislative mandate." *Pressroom Unions-Printers League Income Security Fund v. Continental Assurance Co.,* 700 F.2d 889, 892 (2d Cir.1983). Absent clear Congressional expression that non-enumerated parties such as the appellant have standing to sue under ERISA, we decline to confer such standing.[9]

---

[8]*See, e.g., Yancy v. American Petrofina, Inc.,* 768 F.2d 707, 708 (5th Cir.1985) (denying standing to plaintiff not meeting statutory definition of "participant"); *Joseph v. New Orleans Elec. Pension,* 754 F.2d 628 (5th Cir.1985) (retirees electing lump sum retirement benefits in lieu of monthly pension benefits held not "participants" and refused standing).

[9]In so holding, we are not alone. The *Fentron* zone of interest analysis has been uniformly rejected by other circuits considering this question. *See, e.g., Giardono v. Jones,* 867 F.2d 409,

3. Christopher "But For" Analysis

Coleman next argues that he has standing by way of the "but for" analysis articulated in *Christopher v. Mobil Oil Corp.,* 950 F.2d 1209 (5th Cir.1992). We do not agree. *Christopher* is distinguishable from the present case and does not provide Coleman with standing to bring his suit under ERISA.

In *Christopher,* certain employees brought suit against their employer, Mobil, for, among other things, violations of ERISA. At trial, these employees alleged that Mobil induced them into accepting early retirement and taking a lump sum pension payment, rather than the normal annuity payment. The employees were induced to take this action, they alleged, through Mobil's use of misinformation and manipulation in a scheme contrived to reduce Mobil's work force.

At issue in *Christopher* was whether the plaintiffs had standing under § 1132 as "participants".[10] The Supreme Court, in *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), held that the definition of "participant" in § 1132 referred to "former employees who "have ... a reasonable expectation of returning to covered employment' or who have a "colorable claim' to vested benefits." *Id.* 489 U.S. at 118, 109 S.Ct. at 958. Mobil, relying on *Yancy v. American Petrofina, Inc.,* 768 F.2d 707 (5th Cir.1985), argued that because the plaintiffs had received a lump sum all of the benefits to which they were entitled, the plaintiffs lacked a colorable claim to vested benefits. Mobil also contended that the plaintiffs, because they had taken early retirement, did not have a reasonable expectation of returning to covered employment. As such,

---

413 (7th Cir.1989); *Grand Union Co. v. Food Employers Labor Relations Ass'n.,* 808 F.2d 66, 71 (D.C.Cir.1987); *Dime Coal Co. v. Combs,* 796 F.2d 394, 396 (11th Cir.1986); *Whitworth Bros. Storage Co. v. Central States Pension Fund,* 794 F.2d 221, 228 (6th Cir.), *cert. denied,* 479 U.S. 1007, 107 S.Ct. 645, 93 L.Ed.2d 701 (1986); *International Ladies Garment Workers Union v. Teamsters,* 764 F.2d 147, 153-54 (3d Cir.1985); *Pressroom Unions-Printers League Income Security Fund v. Continental Assurance Co.,* 700 F.2d 889, 892 (2d Cir.), *cert. dismissed,* 463 U.S. 1233, 104 S.Ct. 26, 77 L.Ed.2d 1449, *cert. denied,* 464 U.S. 845, 104 S.Ct. 148, 78 L.Ed.2d 138 (1983).

In a recent case, the Ninth Circuit, while not deciding the issue, raised the question of whether its *Fentron* decision even remains good law in the Ninth Circuit. *See Cripps v. Life Ins. Co. of North America,* 980 F.2d 1261 (9th Cir.1992).

[10]*See supra* note 2.

Mobil concluded, the former employees lacked standing.

The *Christopher* court distinguished *Yancy* however, and stated that the case before it fell somewhere between *Yancy* and *Ingersoll-Rand v. McClendon,* 498 U.S. 133, 142-44, 111 S.Ct. 478, 485, 112 L.Ed.2d 474 (1990) (construing ERISA § 510 as foreclosing any state law cause of action for wrongful termination to prevent vesting of benefits). A wrongfully discharged employee under § 510, the court pointed out, would be a former employee lacking both a colorable claim for vested benefits and (unless he requested reinstatement) a reasonable expectation of returning to employment. Under this analysis, the plaintiff could look solely to ERISA for his remedy, yet he would be denied standing under ERISA. Recognizing the inequity of such a scenario, the court stated:

> It would be unusual if in that situation his ability to assert a claim at all turned on whether or not his requested relief included reinstatement; it would seem more logical to say that but for the employer's conduct alleged to be in violation of ERISA, the employee *would* be a current employee with a reasonable expectation of receiving benefits, and the employer should not be able through its own malfeasance to defeat the employee's standing.

*Id.* at 1221, citing *Amalgamated Clothing & Textile Workers Union, AFL-CIO v. Murdock,* 861 F.2d 1406 (9th Cir.1988) (emphasis in original).

The court held that in situations akin to § 510 violations, where the standing question and merits are "unavoidably intertwined," "whether a plaintiff has standing to assert ERISA rights may depend upon whether he can establish a discharge or some other conduct in violation of ERISA, but for which he would have standing." *Id.* at 1222. The court was careful, however, to contrast that situation with the one in which the alleged violation, such as the one in the present case, was not one that "in and of itself divested aggrieved parties of their status as covered employees able to sue." *Id.*

*Christopher* clearly poses a different scenario than the one we face today. In *Christopher,* this court *restored* ERISA standing to individuals who *had standing* but were divested of that standing through the ERISA violations of their employer. The employees alleged that they had been wrongfully induced to retire, and but for the ERISA violation, would have continued their employment and plan participation, thereby retaining status to sue under ERISA.

In the present case, Coleman never had standing to sue under ERISA since he was neither a Plan participant nor a beneficiary. Thus, even if the Coleman's allegations of ERISA improprieties

were true, those violations could not be said to have divested the him of his status to sue. As such, *Christopher* does not help the appellant.

Murdock Equity Analysis

Like *Christopher, Amalgamated Clothing & Textile Workers Union, AFL-CIO v. Murdock* also fails to provide Coleman with standing to sue under ERISA. In *Murdock,* an employee benefit plan fiduciary breached his duty of loyalty to the plan when he contrived an elaborate scheme to profit on certain "greenmail" stock transactions and pension plan manipulations. The fiduciary, Murdock, invested plan assets in companies in which he personally held substantial shares of stock. Using the leverage he gained through control of the plan shares, Murdock forced the companies to repurchase the plan stock at a premium. These transactions netted the plan millions of dollars.

Murdock obtained this money by causing the plan to be amended, and then taking steps to terminate the plan and have its surplus assets distributed to him. The amendment to the plan provided that any surplus held by the plan would revert to the sponsor, and through a series of transactions, Murdock moved into the role of plan sponsor. He then terminated the plan by paying the participants and beneficiaries the amounts actuarially due them.

The question before the court was whether the participants and beneficiaries, having received all the benefits due them, had standing to seek a constructive trust remedy. Murdock challenged the plaintiffs' standing, citing *Kuntz v. Reese,* 785 F.2d 1410, 1411-12 (9th Cir.), *cert. denied,* 479 U.S. 916, 107 S.Ct. 318, 93 L.Ed.2d 291 (1986), for the proposition that plan participants and beneficiaries have no standing to seek monetary damages for breach of fiduciary duty after they receive their contractually defined and vested benefits from an ERISA plan.

The *Murdock* court distinguished *Kuntz* and found that the participants and beneficiaries did have standing to seek a constructive trust remedy because ill-gotten profits can be held in constructive trust for participants and beneficiaries, and can be construed as equitably vested benefits under an ERISA plan. *Murdock,* 861 F.2d at 1419. Critical to the court's holding was the fact that the fiduciary engaged in a scheme to personally profit from the breach of his duty of loyalty. *Id.* at 1418. The plan amendments provided that any surplus plan profits reverted to the plan sponsor; therefore,

any profits which would have been returned to the plan would have automatically passed to Murdock. The court held that such an outcome would run counter to the goals of ERISA, and stated that

> It would be ironic if the very acts of benefit payment and plan termination that allegedly resulted in a fiduciary personally obtaining ill-gotten profits should also serve to deny plan beneficiaries standing to seek a constructive trust on those profits to redress the fiduciaries' alleged breach of the duty of loyalty.

*Id.*

The *Murdock* court granted standing because it was the "only means available to give effect to the goals of ERISA." *Id.* at 1411. Moreover, the court stressed that its grant of standing was limited to the specific type of scenario before it.

The situation before us today is very different from that in *Murdock.* Coleman never has been a participant in or beneficiary of the Plan, he does not assert any action on the part of Champion to personally profit by its alleged activities, and he has not shown that granting him standing would be the "only means available to give effect to the goals of ERISA." *Murdock* simply does not apply to Coleman's situation; as such, Coleman's reliance on *Murdock* as a basis for standing is misplaced.

### III. CONCLUSION

Because we find that Coleman did not have standing to bring this action under ERISA, we do not reach the merits of his claim. We therefore AFFIRM the judgment below; however, we do so on different grounds than those relied on by the lower court.